Reverend Joseph J. KLEINSASSER, Individually and on Behalf of Susie KLEINSASSER, deceased, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 81-3625.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1982.

Decided June 7, 1983.

Gregory R. Schwandt, Church, Harris, Johnson & Williams, Great Falls, Mont., for plaintiff-appellant.

Libero Marinelli, Jr., Washington, D.C., for defendant-appellee.

Before CHOY and FLETCHER, Circuit Judges, and MacBRIDE,* District Judge.

CHOY, Circuit Judge:

This is a tax-refund suit brought by Reverend Joseph J. Kleinsasser on behalf of himself and his now-deceased wife, Susie Kleinsasser. Reverend Kleinsasser (hereinafter "taxpayer") is a member of a tax-exempt religious organization that is subject to taxation in accordance with I.R.C. § 501(d). Taxpayer argues that he is entitled to the investment tax credit provided by I.R.C. § 38(a) on his 1972 and 1973 tax returns. The court below granted the Government's motion for summary judgment. *Kleinsasser v. United States,* 522 F.Supp. 460 (D.Mont.1981). Reluctantly, we affirm.

* The Honorable Thomas J. MacBride, Senior United States District Judge for the Eastern District of California, sitting by designation.

## I. *Background*

The taxpayer is a member of the Milford Colony in Wolf Creek, Montana. Milford Colony is an incorporated Hutterite community and a unit of the Hutterische Church Society. This society, which dates back to the early 1500's, is an organization of Protestant Christians who live a communal life in colonies of between 80 and 100 members. There are over 30 such colonies in Montana. Colony members take a vow of poverty and engage in agricultural pursuits. Since the individual Hutterites have no personal property, all expenses, both communal and individual, are paid out of a common treasury.

The Hutterites do not vote, but they do participate in civic activities that do not conflict with their religion. They do not accept old age pensions, social security payments and the like from the government because they choose to care for their own aged and disabled. The Hutterites accept the legitimacy of taxation and have a consistent record as conscientious taxpayers.

Religious communities such as Milford Colony are tax exempt under I.R.C. § 501(d), which provides:

*Religious and Apostolic Organizations*

The following organizations are referred to in subsection (a) [which allows tax exemption]: Religious or apostolic associations or corporations, if such associations or corporations have a common treasury or community treasury, even if such associations or corporations engage in business for the common benefit of the members, but only if the members thereof include (at the time of filing their returns) in their gross income their entire pro rata shares, whether distributed or not, of the taxable income of the association or corporation for such year. Any amount so included in the gross income of a member shall be treated as a dividend received.

Accordingly, members of § 501(d) organizations file individual tax returns, and pay income tax on their pro rata shares of organization income. The organization itself must file a partnership tax return, even though it pays no tax. Treas.Reg. § 1.6033–2(e).

I.R.C. § 38(a) allows an investment tax credit for certain acquisitions of depreciable property. Such property is called "section 38 property." Farm equipment and machinery purchased by the Colony in 1972 and 1973 would have definitely qualified for the § 38(a) credit but for I.R.C. § 48(a)(4). Section 48(a)(4) excludes from section 38 property treatment "[p]roperty used by an organization . . . which is exempt from the tax imposed by this chapter [i.e., the income tax]" unless the property is used in "an unrelated trade or business the income of which is subject to tax under section 511." Taxpayer's refund-suit contention is that § 48(a)(4) does not preclude a member of a § 501(d) organization from taking a pro rata tax credit on otherwise qualifying Colony purchases.

## II. *Discussion*

Taxpayer's argument for allowance of a pro rata share of an investment tax credit may be summarized as follows: When Congress excluded property used by tax-exempt organizations from § 38(a) tax-credit treatment, it did not mean to deny tax credits to taxpaying *members* of § 501(d) organizations. This is because § 501(d) organizations are actually partnerships, and should be taxed accordingly. Eligibility for tax credits is also established by reference to the congressional intent behind both the tax credits and the reasons for excluding property used by tax-exempt organizations from § 38(a) investment tax-credit treatment.

This argument fails because of the unambiguous language of the relevant statutes and regulations.

### A. *Characterization of Section 501(d) Organizations*

Section 501(d) was intended to provide tax relief for religious organizations that have a common or communal treasury. Without § 501(d), the income of a religious corporation such as the Milford Colony would be subject to the regular corporate income tax at the corporate level, and, if distributed to organization members, the

individual income tax at the shareholder level. If the corporate income were not distributed, the corporation would pay both the corporate income tax and the accumulated earnings tax. Section 501(d) eliminates the corporate level of taxation and leaves a single tier of individual income taxation. The scanty legislative history suggests that this single tier of taxation was believed to be the fair way to tax members of § 501(d) organizations.[1]

Taxpayer argues that § 501(d) creates a form of partnership. As such, the members of a § 501(d) organization should be taxed as partners. Although the § 501(d) organization itself is tax exempt, the individual members are not, and are thus not precluded from taking advantage of the § 38(a) investment tax credit.

Taxpayer advances a variety of arguments to compel the conclusion that § 501(d) organizations are, in fact, partnerships. He stresses that the Internal Revenue Service has tacitly deemed § 501(d) organizations to be partnerships by requiring them to file partnership tax returns. By contrast, all § 501(c) tax-exempt organizations (charitable organizations) file a special Form 990 return. Treas.Reg. § 1.6033–2(a). The liability for members of § 501(d) organizations is determined through application of partnership accounting principles. Even this court once suggested that Congress intended to create "an association somewhat akin to the ordinary association or partnership in which each member has a definite, though undivided, interest in the business conducted for the common benefit of the members, as well as a common interest in the community treasury and property," although these comments were labeled "gratuitous remarks." *Riker v. Commissioner,* 244 F.2d 220, 230 (9th Cir.) (discussing the 1939 Code predecessor of § 501(d)), *cert. denied,* 355 U.S. 839, 78 S.Ct. 50, 2 L.Ed.2d 51 (1957). Accordingly, taxpayer argues that he should be treated as a partner of an ordinary partnership and allowed his pro rata share of an investment tax credit.

There is no question that § 501(d) organizations bear a fair resemblance to that entity known as a partnership. But under the applicable statutes, § 501(d) organizations simply cannot be characterized as partnerships.

■ The mere filing of a partnership return does not turn a § 501(d) organization into a partnership. *Blume v. Gardner,* 262 F.Supp. 405, 413–14 (W.D.Mich.1966), *aff'd,* 397 F.2d 809 (6th Cir.1968). The partnership tax return allows the Internal Revenue Service to determine how much income must be reported by organization members. It is not a concession of partnership status.

■ More substantively, the Code defines "partnership" in such a way that Milford Colony cannot possibly qualify:

*Partnership and partner*

The term "partnership" includes a syndicate, group, pool, joint venture, or other *unincorporated* organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate *or a corporation;* and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

I.R.C. § 7701(a)(2) (emphasis added). The Milford Colony was organized as a Montana

---

1. The only legislative history on § 501(d) is this excerpt from the Congressional Record concerning the enactment of § 101(18) of the 1939 I.R.C., the predecessor to § 501(d):

It has been brought to the attention of the committee that certain religious and apostolic associations and corporations, such as the House of David and the Shakers, have been taxed as corporations, and that since their rules prevent their members from being holders of property in an individual capacity the corporations would be subject to the undis-

tributed-profits tax. These organizations have a small agricultural or other business. The effect of the proposed amendment is to exempt these corporations from the normal corporation tax and the undistributed-profits tax, if their members take up their shares of the corporations' income on their own individual returns. It is believed that this provision will give them relief, and their members will be subject to a fair tax.

80 Cong.Rec. 9074 (1936).

corporation on November 26, 1946, and has remained incorporated since. A corporation cannot be a partnership for federal income tax purposes. *See O'Neill v. United States,* 410 F.2d 888, 893 (6th Cir.1969); *United States v. Empey,* 406 F.2d 157, 170 (10th Cir.1969). Additionally, there is evidence that Congress intended to treat § 501(d) organizations as corporations. Section 501(d) itself describes the pro rata share allocated to each member as "dividend." The Internal Revenue Service has previously concluded that this language prevented the membership share from being considered a partnership share. Rev.Rul. 58–328, 1958–1 C.B. 327, 328–29.

■ Moreover, corporate status has conferred specific benefits upon Milford Colony. Were the Colony a partnership, the members might have to pay self-employment tax. As dividend recipients, the members do not have to pay this tax. Rev.Rul. 58–328, *supra.* This advantage accompanies all the usual benefits of corporate form that accrue to an entity (although limited liability is of little use to members of a community who have pooled all of their property into the corporate treasury). It is well established that corporate form is not to be disregarded for tax purposes unless the corporation is created for illegitimate purposes or conducts no business activities.

*See, e.g., Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 438–40, 63 S.Ct. 1132, 1133–35, 87 L.Ed. 1499 (1943); *Sherwin v. United States,* 320 F.2d 137, 155 (9th Cir. 1963), *cert. denied,* 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964); *Esmond Mills v. Commissioner,* 132 F.2d 753, 755–56 (1st Cir.), *cert. denied,* 319 U.S. 770, 63 S.Ct. 1432, 87 L.Ed. 1718 (1943).

### B. Application of Section 48(a)(4) to Section 501(d) Organizations

■ Even if the members of Milford Colony could be considered partners in a partnership, they would still be precluded from taking an investment tax credit on the Colony's 1972 and 1973 purchases of farm equipment. The investment tax credit may only be taken on section 38 property. I.R.C. § 48(a)(4) states that property "used" by a tax-exempt organization may be treated as section 38 property only if the property was used "in an unrelated trade or business the income of which is subject to tax." Treas. Reg. § 1.48–1(j) defines property "used" by a tax-exempt organization as "(1) property owned by the organization ....."[2] Taxpayer stipulated, and the lower court found, 522 F.Supp. at 462, that the farm equipment was not used in an unrelated trade or business. (Regarding the logic of this finding, *see infra* pp. 1028–1029.) The lower

**2.** Treas.Reg. § 1.48–1(j) reads in full:

*Property used by certain tax-exempt organizations.* The term "section 38 property" does not include property used by an organization (other than a cooperative described in section 521) which is exempt from the tax imposed by chapter 1 of the Code unless such property is used predominantly in an unrelated trade or business the income of which is subject to tax under section 511. If such property is debt-financed property as defined in section 514(b), the basis or cost of such property for purposes of computing qualified investment under section 46(c) shall include only that percentage of the basis or cost which is the same percentage as is used under section 514(a), for the year the property is placed in service, in computing the amount of gross income to be taken into account during such taxable year with respect to such property. The term "property used by an organization" means (1) property owned by the organization (whether or not leased to another person), and (2) property leased to

the organization. Thus, for example, a data processing or copying machine which is leased to an organization exempt from tax would be considered as property used by such organization. Property (unless used predominantly in an unrelated trade or business) leased by another person to an organization exempt from tax or leased by such an organization to another person is not section 38 property to either the lessor or the lessee, and in either case the lessor may not elect under § 1.48–4 to treat the lessee of such property as having purchased such property for purposes of the credit allowed by section 38. This paragraph shall not apply to property leased on a casual or short-term basis to an organization exempt from tax.

Note that this regulation gives a very narrow scope to the § 48(a)(4) exclusion, since "use" could conceivably include any sort of utilization, with or without lease or sale. Taxpayer does not challenge the validity of Treas.Reg. § 1.48–1(j); indeed, the regulation is never even mentioned in either of taxpayer's briefs.

court further found that the farm equipment was purchased and owned by Milford Colony, Inc., a tax-exempt organization. 522 F.Supp. at 462–63. So, even if the members of Milford Colony were to be considered taxable partners, they could not take a tax credit on the Colony's purchases of farm equipment because property owned by a tax-exempt organization and not used in an unrelated business is *not section 38 property.*

Taxpayer seeks to avoid the force of this argument through analogy to *Xerox Corp. v. United States,* 656 F.2d 659 (Ct.Cl.1981). *Xerox* concerned I.R.C. § 48(a)(5), which states, *inter alia,* that property used by the United States may not be treated as section 38 property. The Internal Revenue Service had disallowed Xerox's claim for an investment tax credit on machines it had apparently leased to the government. Xerox conceded that if the machines were in fact leased to the government, they would not qualify as section 38 property. However, Xerox argued, and the Court of Claims so held, that the machines were not leased, but rather provided to the government as an integral part of a copying service. 656 F.2d at 677. Treas.Reg. § 1.48–1(k), parallel to § 1.48–1(j), defines property used by the government as property owned or leased by the government. Since Xerox's machines were neither owned nor leased by the government, I.R.C. § 48(a)(5) did not exclude them from treatment as section 38 property. There is nothing in this factual holding by the Court of Claims to support taxpayer's assertion that the court should look past the undisputed ownership of property by tax-exempt Milford Colony and find that the express language of Treas.Reg. § 1.48–1(j) should be ignored.

C.  *Legislative History and Purpose of the Section 38(a) Investment Tax Credit and the Section 48(a)(4) Limitation*

■ Taxpayer's only remaining argument is that a denial of the investment tax credit to members of § 501(d) organizations is contrary to congressional intent. Since the plain language of the Code and its regulations clearly denies to taxpayer the

credit he seeks, we survey the legislative record for "clear contrary evidence of legislative intent." *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974).

The § 38(a) investment tax credit was enacted as part of the Revenue Act of 1962, Pub.L. No. 87–834, 76 Stat. 960. The credit was intended to spur economic growth by encouraging investment and capital formation. S.Rep. No. 1881, 87th Cong., 2d Sess. 10, *reprinted in* 1962 U.S.Code Cong. & Admin.News 3297, 3314. At least one stated objective is fully applicable to taxpayers such as the Hutterites: "The objective of the credit is to reduce the net cost of acquiring new equipment; this will have the effect of increasing the earnings of new facilities over their productive lives and increasing the profitability of productive investment." *Id.*

By contrast, the stated reason for excluding property used by a tax-exempt organization from section 38 property treatment does not appear to apply very well to the Hutterites or any other § 501(d) organization. The full legislative explanation for the § 48(a)(4) exclusion is as follows:

> Property used by a tax-exempt organization (other than in a business to which the unrelated business income tax applies). The limitation on the allowance of the credit in this case is designed to prevent an investment for use in connection with an exempt function from decreasing any tax on an unrelated trade or business.

S.Rep. No. 1881, 87th Cong., 2d Sess. 16, *reprinted in* 1962 U.S.Code Cong. & Admin. News 3297, 3319. This legislative purpose has little relevance to § 501(d) organizations because the "unrelated trade or business" concept itself has no application to § 501(d) organizations.

When Congress enacted § 48(a)(4), its apparent focus was upon § 501(c) charitable organizations. These organizations are tax exempt except for business operations that do not relate to the *function* for which the organization was granted its exemption.

I.R.C. § 513(a) defines "unrelated business or trade" as

> any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other *purpose or function constituting the basis for its exemption under § 501* . . . .

(Emphasis added.) I.R.C. § 511 imposes a tax on this unrelated business income, and § 512 defines the taxable income of an unrelated business or trade. For example, an exempt scientific organization that sells endorsements of laboratory equipment would have its endorsement income taxed, since product endorsement is not substantially related to the purposes for which the organization was granted its exemption. Treas. Reg. § 1.513–1(d)(4)(iv), example (1). The objective of the unrelated business income tax is to prevent unfair competition by tax-exempt organizations when they compete against entities subject to tax. Treas.Reg. § 1.513–1(b); *see* Bittker & Rahdert, *The Exemption of Nonprofit Organizations from Federal Income Taxation,* 85 Yale L.J. 299, 316–26 (1976).

Nothing about the doctrine of "unrelated trade or business" has any relevance to a § 501(d) organization because this organization is granted its exemption not because of function, but because of *form.* It is totally unrestricted in function. Indeed, § 501(d) specifically allows the organizations it exempts to engage in business and thus compete with nonexempt entities. The only requirements for the exemption are that there be a common treasury, that the members of the organization include pro rata shares of organization income when reporting taxable income and, implicitly, that the organization have a religious or apostolic character. Once this requirement of form is fulfilled, the exempt organization is unlimited as to function. It can farm, as the Milford Colony does, or engage in manufacturing, or any other business or combination of businesses. It is definitionally impossible for a § 501(d) organization to have unrelated trade or business income. If the organization had income that it failed to allocate to its members, it would simply lose its exemption altogether.

The unlimited scope of a § 501(d) organization's allowable trade or business supports an inference that § 48(a)(4) has no readily identifiable purposes in excluding § 501(d) organizations from taking advantage of the § 38(a) tax credit. Section 48(a)(4)'s stated purpose is to prevent tax-exempt organizations from using credits from tax-exempt functions to reduce the tax burden on nonexempt functions, and thus establish a competitive advantage that § 511 was designed to eliminate. Since a § 501(d) organization cannot, by definition, have unrelated business income, it accordingly cannot use tax-exempt operations to shelter nonexempt income.[3]

Our conclusion from this brief statutory exegesis is that the exclusion of § 501(d)

---

3. *See also* 6 J. Mertens, *Law of Federal Income Taxation* § 34.41 (1975) (stating, rather cryptically, that § 501(d) organizations are not subject to the tax on unrelated business income).

The Government offers two justifications for the § 48(a)(4) exclusion, though neither is supported by any statutory or legislative evidence. First, the Government argues that since groups such as the Hutterites live simple, nonmaterialistic lives, a tax credit would not be an incentive to invest in capital. This, of course, makes little logical or economic sense. One of the stated purposes of the investment tax credit is to make capital acquisition less expensive; to the extent the Hutterites desire to use their income to make capital purchases, they will purchase more if they are allowed an investment tax credit. Further, the § 501(d) exemption is not limited to nonmaterialistic sects; the members of a § 501(d) organization could live in luxury as long as all income is allocated pro rata and reported on the members' individual tax returns.

The Government also argues that the loss of an investment tax credit is the price the Hutterites pay for an exemption from a tier of corporate taxation. This contention may well describe the state of the law, but there is little evidence that it was for that reason that Congress made property owned or used by § 501(d) corporations ineligible for the investment tax credit.

organizations from the tax credit offered by § 38(a) does not seem to advance any articulated legislative purpose. But it is equally clear that there is nothing in the legislative record to suggest that Congress meant to exempt § 501(d) organizations from the sweep of § 48(a)(4). The lack of clear contrary legislative intent gives us no choice but to enforce the plain language of the statute.

III. *Conclusion*

We cannot put an equitable gloss on the clear language of the Internal Revenue Code. The statutory inequity involved in this case, if there is one, may only be remedied by Congress. We realize that, in light of the Hutterites' religiously based abstention from secular politics, it may ring hollow to advise the members of Milford Colony to go to Congress for relief. But it is from that body alone that relief is available.

AFFIRMED.